# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, EX. REL. KEITH MITCHELL, Petitioner, vs. WARDEN THOMAS ROTH for Dixon Correctional Center, and ATTORNEY GENERAL OF ILLINOIS, Respondent. | No.: Judge: LEFKOW Magistrate: MAGISTRATE JUDGE DENLOW |

FILED
DEC 1 4 2000
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**NOTICE OF FILING AND CERTIFICATE OF SERVICE**

00C07880

TO:  Jim Ryan, Attorney General of Illinois
100 W. Randolph Street, 12th floor
Chicago, Illinois 60601

Keith Mitchell
Dixon Correctional Center
Dixon, Illinois 61021

Warden Thomas Roth, Dixon
Correctional Center
2600 Brinton
Dixon, Illinois 61021

Richard Divine
States Attorney of Cook County
Richard Daley Center
Chicago, Illinois 60601

**PLEASE TAKE NOTICE** that on the 14th day of December, 2000, I caused to be filed with the Clerk of the United States District Court, Northern District of Illinois, Eastern Division, the enclosed Petition Under 28 USC Sec. 2254 for Writ of Habeas Corpus by a Person in State Custody.

**Please be further advised**, that I certify under penalty of perjury, that I served this notice and attached document to the above named person via United States Mail, on December 14, 2000.

Joan A. HillMcClain
33 N. LaSalle, Suite 3300
Chicago, Illinois 60602
(773) 924-8477

DOCKETED
DEC 1 8 2000

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION



RECEIVED
DEC 14 2000
MICHAEL W. DOBBINS, CLERK
UNITED STATES DISTRICT COURT

| | |
|---|---|
| UNITED STATES OF AMERICA, EX. REL. KEITH MITCHELL, Petitioner, | No.: 00C07880 |
| vs. | |
| WARDEN THOMAS ROTH for Dixon Correctional Center, and ATTORNEY GENERAL OF ILLINOIS, Respondent. | Judge: LEFKOW <br> Magistrate: <br> MAGISTRATE JUDGE DENLOW |

**PETITION PURSUANT TO 28 USC. 2254 FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

KEITH MITCHELL ("Petitioner"), by his attorney, JOAN A. HILLMcCLAIN, pursuant to Title 28, United States Code, Sec. 2254, moves this HONORABLE COURT for a writ of Habeas corpus.

**DOCKETED**
**DEC 1 8 2000**

In support thereof, Petitioner states:

1. At the age of 15, Petitioner was charged, along with two codefendants with multiple offenses, including but not limited to, first degree murder and attempted first degree murder. Petitioner was charged under indictment number 92 CR 19459.

2. On July 13, 1995, Petitioner was found guilty of first degree murder and aggravated discharged of a fire arm pursuant to Chapter 720 of the Illinois Complied Statutes.

3. On September 14, 1995, judgment and sentence were entered, and Petitioner was sentenced to thirty (30) year in the Illinois Department of Corrections.

4. Petitioner's conviction was affirmed by the Illinois Appellate Court on July 13, 1998. Petitioner filed a Post-Conviction Petition on December 31, 1998, and said petition was denied on January 11, 1999. On June 14, 1999, the trial court set a new Post-Conviction hearing date. On December 14, 1999, Judge Fiala denied Petitioner's Post-Conviction Petition.

5. On August 1, 1992, at approximately 10:00 p.m., Chicago Police Officers went to Petitioner's home. (R. X-131-132). Petitioner was not at home. Petitioner's younger sister and cousin were home alone, and the police entered Petitioner's home. Shortly thereafter, Petitioner's sister telephoned her mother and told her that two police officers were inside of their home. (R. 131-132).

The officers spoke with Petitioner's mother, Audrey Mitchell ("Ms. Mitchell"), via the telephone, and the officers told Ms. Mitchell that they were investigating a murder and that they wanted to speak with Petitioner. (R. X-132-133). Later that evening, Ms. Mitchell, her sister-in-law, Latrica Mitchell, and her sister, Diane Streeter, located her son, Petitioner. (R. X-134; Ms. Mitchell's Affidavit). At approximately, 12:00 midnight, all three women took Petitioner to 111th Street Police Station. (R. X-134; Ms. Mitchell's Affidavit). Once at the police station, Ms. Mitchell took her son to the front desk and asked to speak with the officers who had been at her home earlier that day. (R. X-134-135). Petitioner and his mother were taken upstairs and placed in a small interrogation room. (R. X-135; Ms. Mitchell's and Petitioner's Affidavits).

According to both Petitioner and his mother, Detectives McDermott and Wilkins did not advise Petitioner of his rights pursuant to Miranda; instead, both officers immediately began to interrogate Petitioner about a homicide that had occurred at 79th

2

and Ellis. (R. X-136; Ms. Mitchell's and Petitioner's Affidavits). While his mother was present, Petitioner denied having any personal knowledge of the homicide. (R. X-136; Ms. Mitchell's and Petitioner's Affidavits). Petitioner also denied any involvement with the homicide. (R. X-136; X-175; Ms. Mitchell's and Petitioner's Affidavits).

It is undisputed that Petitioner's mother left the interrogation room several times to make necessary telephone calls. (R. X-137-142; X-173-177; Ms. Mitchell's and Petitioner's Affidavits). On at least two of the occasions when Petitioner's mother left the room, she instructed Petitioner, in the presence of the officers, not to speak with the officers during her absence. (R. X-137; Ms. Mitchell's and Petitioner's Affidavits). Despite Ms. Mitchell's instructions, the officers continued interrogating Petitioner during his mother's absence. (R. X-173-175; Petitioner's Affidavit).

After Petitioner's mother returned a third time, Petitioner told her that he wanted to go home. (Ms. Mitchell's and Petitioner's Affidavits). At approximately 1:35 a.m., Petitioner's mother told the officers that it was late and that she and her son were ready to leave. (Ms. Mitchell's and Petitioner's Affidavits). Ms. Mitchell was told for the first time that Petitioner was not going to be allowed to leave. (Ms. Mitchell's Affidavit). At this point the officers and Ms. Mitchell had a heated exchange; Ms. Mitchell told the officers she was going to call a lawyer if she was not permitted to leave with her son. (Ms. Mitchell's and Petitioner's Affidavits). Ms. Mitchell left the room and called for a lawyer. (R. X-142). Ms. Mitchell returned to the interrogation room and informed the detectives that she had summoned a lawyer for Petitioner. Again, Ms. Mitchell was required to leave the interrogation room to call their lawyer. However, upon her return, the officers refused to allow Ms. Mitchell to reenter the interrogation room and threatened

3

to arrest her if she attempted to enter the interrogation room where her son was being held. (R. O 14; Ms. Mitchell's Affidavit). Ms. Mitchell went to the lobby and waited for their lawyer. Ms. Mitchell waited in the lobby with her sister-in-law and Ms. Streeter. (Ms. Mitchell's and Ms. Latrice Mitchell's Affidavits). Ms. Mitchell denied being angry or fighting with her son. (R. O 16-17; Ms. Mitchell's Affidavit; Keith Mitchell's Affidavit).

While Ms. Mitchell waited downstairs for their lawyer, Assistant State's Attorney Sharon Jefferson ("ASA Jefferson") and the detectives proceeded to further question Petitioner. (R. 176-177; Petitioner's Affidavit). Petitioner asked for his mother. (Petitioner's Affidavit). He was told that his mother had left the police station. (Petitioner's Affidavit). At some point a youth officer was summoned; however, Petitioner believed the youth officer was another police officer and was unaware of the role of a youth officer, so he continued to ask for his mother. (Petitioner's Affidavit). ASA Jefferson attributes an oral inculpatory statement to Petitioner. (R. X-99-109). Detective McDermott testified that Petitioner was arrested at 2:00 or 3:30 a.m. (R. L 32). It should be noted that Youth Officer Stevenson testified that he was not summoned to the interrogation room where Petitioner was being held until sometime between 2:45 a.m. and 3:00 a.m.

The trial court denied Petitioner's request to quash and suppress the foregoing statement, and the statement was admitted into evidence during Petitioner's trial.

6. At trial, ASA Jefferson testified that she introduced herself to Petitioner and his mother and then proceeded to interrogate Petitioner. (R. X 94-101). ASA Jefferson further testified that during her interview with Petitioner, while Ms. Mitchell

4

was present, Petitioner denied any involvement with the homicide. (R. X 99-101). ASA Jefferson testified that after Petitioner's mother left the room, Petitioner requested to speak with the detectives and ASA Jefferson outside of the presence of his mother. (R. X 102-104).

ASA Jefferson testified that during Petitioner's mother's absence, Youth Officer Stevenson, was present while she interrogated Petitioner. She further testified that Petitioner admitted his involvement in the shooting. (R. X-109). Shortly after obtaining the inculpatory statement from Petitioner, ASA Jefferson testified that she learned that a lawyer was at the station demanding to speak with Petitioner. (R. X-109).

7. ASA Jefferson's testimony regarding her alleged meeting with Petitioner and his mother was clearly impeached on cross examination. (R. X-116-117; Exhibit F, ASA Jefferson's Memo). ASA Jefferson wrote a detailed memorandum regarding her contact with Petitioner, neither her detailed memorandum, nor her Felony Review Folder mentioned any contact, conversation or meeting where Petitioner and Petitioner's mother were both present. (R. X-116-117; Exhibit F, ASA Jefferson's Memo). Prior to her testimony, ASA Jefferson never mentioned the fact that she had any contact with Petitioner's mother.

Furthermore, the fact that ASA Jefferson allegedly met with Petitioner and his mother and advised him of his Miranda rights was never memorialized in any police case report, supplemental report, or any other police report. (Exhibit D, Police Report referencing Petitioner's contact with ASA Jefferson). Equally important, the police officers who were supposedly present with ASA Jefferson when she met with Petitioner and Ms. Mitchell authored a report which details a meeting where the only participants

5

were Petitioner, ASA Jefferson and the police officers. The report is conspicuously silent about the whereabouts of Ms. Mitchell.

Ironically, according to the police officers' report, after ASA Jefferson arrived to take Petitioner's statement, she specifically asked him if he wanted to have his mother or any other family member present. (Exhibit D, p.6). And, of course, Petitioner (a frightened fifteen year old) states no. Youth Officer Stevenson testified that he did not prepare any report regarding his contact with Petitioner. There is no evidence of what, if anything, Youth Officer Stevenson did to protect Petitioner's right.

8. Petitioner denied arguing with his mother. Further, Petitioner denied he wanted to speak with the detectives and ASA Jefferson outside of the presence of his mother. (Petitioner's Affidavit).

9. Petitioner testified that on one occasion when his mother left the interrogation room, at least five (5) officers entered the room and started intimidating him. (R. P.9, 26). One of the detectives told Petitioner that if he confessed to shooting at least one person he would receive probation, and not go to jail. (R. P 7-11).

10. Detective McDermott testified that during Petitioner's mother's long absence from the interrogation room he believed that she was somewhere in the building, either in the cafeteria or washroom. (R. R 8). There is no evidence that any of the detectives or police officers went to locate Ms. Mitchell to tell her that Petitioner wanted to speak with the officers outside of her presence.

11. Petitioner stated that he was "scared" of the police officers, and he believed that he had to speak with the officers. (R. P 24-25).

6

12. Neither the police officers, nor ASA Jefferson had Petitioner execute a waiver of rights form which is commonly used for such interrogations. The waiver of rights form would have verified that Petitioner was advised of his rights under *Miranda*. *Miranda v. Arizona*, 384 U.S. 436 (1966).

13. On August 2, 1992, although a recent eight grade graduate, Petitioner did not understand the terms "constitutional rights." Further, Petitioner did not understand his Miranda warnings. (Petitioner's Affidavit).

14. At trial, Petitioner testified that on July 22, 1992, he was not involved in the shooting incident, and that he did not know the deceased. (R. FF 50; FF 49). Further, Petitioner again denied making an oral confession to the detectives and ASA Jefferson. (R. FF 56). Petitioner denied being in a gang and being present for the gang initiation of Gene Keller. (R. FF 74-75).

15. There was no physical evidence or eye witness evidence offered by the State to establish a nexus between Petitioner and the shootings. The only evidence linking Petitioner to the shooting of July 22, 1992 is the oral statement testified to by the police officers and A.S.A. Jefferson.

16. In the State's rebuttal case, Gene Keller testified that Petitioner was present at his gang initiation. (R. GG 40). However, Gene Keller later executed an affidavit where he admitted that he lied against Petitioner in exchange for "not being prosecuted for" fleeing the scene of an accident and eluding the police. (Exhibit E). The foregoing plea negotiation was never disclosed to Petitioner.

17. During the Petitioner's trial, the State submitted Illinois Pattern Instruction ("I.P.I") 3.06. I.P.I. 3.06 assumed that Petitioner made the oral statement to the

7

detectives and ASA Jefferson. I.P.I. 3.06 does not include the language "it is for you to determine whether defendant made the statement" which is included in I.P.I. 3.06-3.07. Despite the fact that Petitioner denied making the statement, Petitioner's attorney did not object to the incorrect jury instruction being given. (R. GG 20). Here, the jury was given an instruction that the statement attributed to Petitioner was indeed made by Petitioner.

## ARGUMENT

### 1. A CONFESSION OBTAINED WHEN PETITIONER WAS A MINOR IS INVOLUNTARY WHERE THE POLICE CONDUCT FRUSTRATED HIS PARENT'S EFFORTS TO SAFEGUARD HIS CONSTITUTIONAL RIGHT TO REMAIN SILENT AND TO CONSULT WITH AN ATTORNEY DURING INTERROGATION.

At all times relevant herein, Petitioner was a fifteen year old black male being reared by a single mother. It behooves this Court to not only examine the totality of the facts surrounding Petitioner's statement, but this Court must examine sociological factors, i.e., race, gender, education, that obviously played a significant role in what occurred. The courts cannot continue to ignore the fact that a person's race, gender, education, financial resources are equally relevant in how law enforcement view and treat potential suspects. Derrick A. Bell, *Race, Racism, and American Law* (1973).

Historically, the rights of members of an underrepresented group are often slighted, and sometime outright ignored by law enforcement officers. A. Leon Higginbotham, *In A Matter of Color* (1978). Not only does Petitioner belong to race who rights have often been, and continue to be, abridged, but he was a minor who had recently graduated from eight grade and was attending his first year of high school at the time he

8

was interrogated by police officers and the assistant state's attorney. Nonetheless, the trial court held Petitioner to the same standard as an intelligent mature adult.

The federal constitution guarantees all United States citizens protection from self-incrimination. U.S. Cont. amend. V. For a confession to be admissible at trial it must be made freely and voluntarily and without any implied promises, however slight, nor by the exertion of improper influences. *Malloy v. Hogan*, 378 U.S. 1 (1964).

Additionally, the state of Illinois provides juveniles with an additional safeguard to the fifth amendment by imposing a statutory duty on a law enforcement officer who has taken a juvenile in custody to immediately notify a parent so that the parent may confer and counsel with the minor before interrogation. 705 ILCS 405 /5-6; *People v. Montanez*, 273 Ill. App.3d 844, 652 N.E.2d 1271 (1st Dist. 1995) (failure to have an opportunity to confer with parent or concerned adult is material in determining whether minor's statement was voluntary).

The Illinois courts in determining whether a confession was voluntary have considered the defendant's age, education, intelligence, experience, physical condition, the length of the interrogation, the existence of threats, promises, or physical coercion, whether the confession was induced by police deception, and whether the accused was informed of his constitutional rights. *People v. Martin*, 102 Ill.2d 412, 427, 466 N.E.2d 228, 230, (1st Dist. 1984); *People v. MacFarland*, 228 Ill.App.3d 107, 592 N.E.2d 471 (1992).

The Illinois courts have consistently found that a statement is involuntary where police officers have frustrated a parent's efforts to confer with his minor child prior to or during interrogation. *In re J.J.C.*, 294 Ill.App.3d 227, 689 N.E.2d 1172 (1st Dist. 1998)

9

(statement involuntary where juvenile's parents are present and request to confer with their child was refused); *In re V.L.T.*, 292 Ill.App.3d 728, 686 N.E.2d 49 (1st Dist. 1997) (minor's statement involuntary where officers failed to allow minor to confer with her grandmother.); *People v. Brown*, 182 Ill.App.3d 1046, 538 N.E.2d 909 (1st Dist. 1989) (minor's statement involuntary where officers were instructed by parent to contact her if minor was to be questioned again). Further, the presence of a youth officer does not *per se* make the statement voluntary. *People v. Fuller*, 292 Ill.App.3d 651, 686 N.E.2d 6 (1st Dist. 1997).

The benchmark for determining that a statement is voluntary is whether the will of the accused was overborne at the time the statement was obtained. *People v. Brown*, 169 Ill.2d 132, 661 N.E.2d 287 (1996). Also, voluntariness is to be determined by the totality of the circumstances. *People v. Travis*, 122 Ill.App.3d 671, 462 N.E.2d 654 (1st Dist. 1984).

Herein, Petitioner's mother, Ms. Mitchell, took him to the police station at 12:00 midnight. A reasonable inference can be drawn from the facts that Ms. Mitchell did not consult with a lawyer prior to taking Petitioner to the police station. Equally clear from the record is the fact that Ms. Mitchell did not take a lawyer to the police station with her and her son; instead, she went to the police station with her sister-in-law and a friend.

In examining what occurred after Petitioner arrived at the police station, this Court must find that the police officers' and ASA Jefferson's conduct was highly suspicious, and resulted in a violation of Petitioner's constitutional rights. According to the officers or detectives, when Ms. Mitchell and Petitioner were seated in an interrogation room, the detectives stated that they informed Petitioner of his rights per

10

*Miranda*, and Petitioner denied any knowledge of the shooting that occurred on July 22, 1992. Sometime later, after Ms. Mitchell had left the interrogation room for a brief period, the detectives and ASA Jefferson claimed that Petitioner wanted to speak to them while his mother was out of the room.

What happened next is greatly disturbing. The detectives and ASA Jefferson interrogated Petitioner under the auspices that Petitioner had provided them with permission to speak with him. The problem here is that neither the detectives nor the ASA Jefferson attempted to locate Ms. Mitchell to tell her that her son had asked to speak with them outside of her presence. The *Brown* case clearly articulated the premise that when the police knows of a parent's presence in a station, the police officer has an affirmative duty not to question the minor without parental consent. *People v. Brown*, 182 Ill.App.3d 1046, 538 N.E.2d 909 (1st Dist. 1989). Detective McDermott testified that he believed that Ms. Mitchell was somewhere in the building, either in the cafeteria or washroom. In any event, it is clear from the record that the officers and the prosecutor had an affirmative duty to consult with Petitioner's mother before speaking with Petitioner outside of the presence of his mother. *People v. Brown*, 182 Ill.App.3d 1046, 538 N.E.2d 909 (1st Dist. 1989).

The detectives and ASA Jefferson attorney knew that Ms. Mitchell was there to protect the rights of her son. The policy rationale underlying, and indeed the linchpin of the Illinois Juvenile Code is to permit the parents of a juvenile to act as a buffer between the juvenile and law enforcement. 705 ILCS 405/5-6.

Certainly, Ms. Mitchell was doing the best she could to protect Petitioner until she was barred from reentering the interrogation room. On at least two occasions before

11

leaving Petitioner alone, she instructed Petitioner not to speak with the police. When Ms. Mitchell realized that Petitioner was not going to be allowed to leave with her, she immediately left the interrogation room to call a lawyer. Given these facts, it is implausible to conceive that Ms. Mitchell would simply leave her son.

The mere fact that Ms. Mitchell came to the police station with her son and advised him, undeniably establishes that she wanted to protect her son's rights and should have continued to be allowed to confer with Petitioner. *In re J.O.*, 231 Ill.App.3d at 855, 596 N.E.2d 1285 (1st Dist. 1992). What is plausible is the fact that when the police realized that Ms. Mitchell was not going to permit them to continue to interrogate her son without a lawyer, the detectives had to bar her access to her son. What better way to get a statement from a juvenile than to convince the juvenile that his mother had left the station, abandoned him and make promises of leniency. Unlike the *Brown* case, where the police ignored the request of the mother of the juvenile to be notified of further interrogation, the police in the instant case went a step further and deliberately prohibited Ms. Mitchell's continued access to Petitioner. *People v. Brown*, 182 Ill.App.3d 1046, 538 N.E.2d 909 (1st Dist. 1989). Petitioner would not have made an inculpatory statement had Ms. Mitchell been permitted to return to the interrogation.

Additionally, the mere fact that Youth Officer Stevenson was brought into the interrogation room does not change anything. There is no indication that Youth Officer Stevenson was acting in the best interest of Petitioner. The record contains no evidence that Youth Officer Stevenson ever spoke with Petitioner alone and attempted to establish a relationship with Petitioner. The absence of Petitioner's mother to intervene on his be behalf obviously resulted in coercion. If Petitioner's mother was not going to be allowed

12

to continue her vigilance over her son's rights, Petitioner should have been afforded a lawyer to advise him before interrogation. Thus, based on the totality of the circumstances, it is patently clear Petitioner's statement was involuntarily obtained.

It should be further noted, that the prosecutor had an affirmative obligation to Petitioner to afford him constitutional protection. In light of the fact that ASA Jefferson's credibility was significantly impeached, her testimony must be afforded limited, if any, weight. The combined conduct of the detectives and ASA Jefferson was outrageously egregious, and is an affront to justice.

ASA Jefferson was definitely impeached by her own report regarding her contact with Petitioner. ASA Jefferson's memorandum never once does she mentioned this alleged exculpatory statement Petitioner made to her allegedly while his mother was present. As a matter of fact, ASA Jefferson's memorandum does not even mention Ms. Mitchell. Additionally, ASA Jefferson was further impeached by the detectives' report. Again, there is no mention of the fact that Ms. Mitchell was ever in the interrogation room with Petitioner at the time Petitioner allegedly made an exculpatory statement to ASA Jefferson. Despite the impeachment of ASA Jefferson, the trial court admitted the alleged oral statement of Petitioner. This statement was the only evidence linking Petitioner to the July 22, 1992 shooting. Absent this alleged oral statement, the State had no case against Petitioner.

The obvious violations by the detectives and ASA Jefferson hampered Petitioner's constitutional rights guaranteed by the fifth amendment. Thereby, Petitioner was denied a fair trial. Accordingly, Petitioner respectfully ask this Court to grant his Habeas and vacate the judgment of conviction imposed by the trial court.

13

## II. PETITIONER WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHERE TRIAL COUNSEL FAILED TO OBJECT TO THE WRONG ILLINOIS JURY PATTERN INSTRUCTION BEING GIVEN TO THE JURY.

The sixth amendment right guarantees that a criminal defendant will not be convicted of an offense without effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 688 (1984). In Strickland, the Supreme Court enumerated the principles governing a defendant's claim that his attorney rendered constitutionally ineffective assistance at trial. *Id.* at 466 U.S. 688 (1984). The benchmark for judging a claim of ineffectiveness is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Id.* at 466 U.S. 688 (1984); *United State v. Cronic,* 466 U.S.684 (1984).

The burden is on the defendant to establish the two components of *Strickland*; (1) that counsel's performance was constitutional deficient, and (2) that the deficiency prejudiced defendant's position.

### The Performance Component

*Strickland* requires a reviewing court to determine whether in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. 466 U.S. at 690; *Kimmelman v. Morrison*, 477 U.S. 356 (1986). In the instant case, trial counsel at a critical stage failed to render competent representation when he did not object to a glaring error by the court. The State offered

14

I.P.I. 3.06 which assumed that the oral statement Petitioner denied making was indeed made by Petitioner. Illinois Pattern Jury Instructions provide two versions of the instructions relating to statements or confessions. One version assumes that the statement was made. The other version includes language that leaves it to the province of the jury to determine whether it believe the statement was made.

Although, the State offered the instruction that assumed Petitioner made the statement, defense counsel did not object to the instruction being giving. Defense counsel knew that the State's case rested on the alleged oral statement attributed to Petitioner. Equally important, defense counsel knew that Petitioner denied making that particular statement. Based on the facts presented to the jury counsel had an obligation to object to the State's version of the instruction and request the correct version of the instruction. Defense counsel failure to act on Petitioner's behalf and exercise correct knowledgeable advise at the instruction conference denied Petitioner's continued meaningful participation in his trial. Accordingly, the first prong of *Strickland* is met.

### The Prejudice Component

*Strickland* held that "an error by counsel, even professionally unreasonable, does not necessarily warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 688. However, if trial counsel's incompetence prejudiced the defendant, defendant need only show a "reasonable probability that, but for counsel's unprofessional error, the results of the proceedings would be different." *Id*. at 694.

15

There can be no question in the instant case that defense counsel's ineffectiveness caused substantial prejudice to Petitioner. There is more than a reasonable probability that but for defense counsel's failure to request the correct instruction Petitioner would have been acquitted. Here, the State's entire case rested on the alleged oral statement of Petitioner. The obvious bias and motive of the detectives and ASA Jefferson to create or coerce a statement from Petitioner was painfully apparent. The detectives and ASA Jefferson wanted a conviction, and they needed a statement from Petitioner for a conviction. Based on the facts surrounding the obtainment of the statement, clearly the statement is inherently unreliable. With the correct instruction the jury could have reasonable deduced that the statement was not made by Petitioner. Herein, the jury was denied the ability to determine whether the statement was made by Petitioner; instead, the jury was told that Petitioner made the statement. The outcome of the jury deliberations would have been different if defense counsel would have objected to the State's version of the instruction and requested the version that included the language "it is for you to determine whether defendant made the statement." Thus, defense counsel failure to act knowledgeably resulted in Petitioner being found guilty.

Based on all the facts and augment set forth herein Petitioner respectfully asks that this Court enter an Order granting his Habeas.

18. Petitioner was represented at trial by Craig Katz; on appeal by Gordon Berry, State Appellate Defender; and at post conviction by Frederick Cohn.

19. Petitioner has no other sentence to served after he completes the sentence imposed by the trial court.

20. Petitioner's Affidavit is Exhibit A, Ms. Mitchell's Affidavit is Exhibit B, and Latrica Mitchell's Affidavit is Exhibit C.

WHEREFORE, Petitioner respectfully requests that this Court vacate the judgment of conviction pursuant to 28 U.S.C. Sec. 2254.

Respectfully,

Joan A. HillMcClain
33 N. LaSalle, Suite 3300
Chicago, Illinois 60602
(773) 924-8477

## DECLARATION

The undersigned declare under penalties of perjury that the Habeas Petition herein has been authorized by Petitioner, KEITH MITCHELL. Petitioner's affidavit is attached herein. This Petition is true and accurate and based on transcripts, affidavits and police reports.

Joan A. HillMcClain
Attorney for Petitioner
33 N. LaSalle, Suite 3300
Chicago, Illinois 60602
(773) 924-8477

FOR EXHIBITS, PLEASE SEE CASE FILE